UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

MICHAEL BRAWER and
PHILIP GALGANO,

              *Plaintiffs*,

     - against -

EGAN-JONES RATINGS COMPANY and
SEAN EGAN,

              *Defendants*.

Civil Action No. 24-CV-1895

**COMPLAINT**

Jury Trial Demanded

---

Plaintiffs Michael Brawer and Philip Galgano, by and through their counsel, Petrillo Klein & Boxer LLP, bring this action against Defendants Egan-Jones Ratings Company ("Egan-Jones") and Sean Egan and allege, based on personal knowledge as to themselves and their acts, and upon information and belief as to all other matters, as follows:

**PRELIMINARY STATEMENT**

1.   The Dodd-Frank Wall Street Reform and Consumer Protection Act (the "Dodd-Frank Act") took steps to reform the credit rating agency industry in critical ways important to safeguarding the financial markets, including the management of conflicts of interest between commercial motivations and the pursuit of analytical rigor in the ratings process.  In addition, the Dodd-Frank Act increased protections for whistleblowers who raise complaints about potential violations of those rules and procedures.  This complaint arises out of a series of repeated, continuous, and severe failures by Egan-Jones as a regulated organization and by the individual executives responsible for its management and governance.

2.   For some two years prior to their unlawful termination, Plaintiffs were senior employees of Egan-Jones and observed an ongoing pattern of improper conduct that Plaintiffs reasonably

believed constituted potential violations of federal securities law and, in particular, the prohibitions against issuing ratings based upon commercial motivations.  In good faith, Plaintiffs repeatedly objected to the conduct and reported the violations internally to Egan, Egan-Jones's in-house counsel, and Egan-Jones's board of directors.  Plaintiffs also raised their concerns with Egan-Jones's outside counsel and with the independent consultant retained by Egan-Jones pursuant to its earlier settlement with the Securities and Exchange Commission ("SEC") of similar charges.  In addition, Plaintiffs raised their reasonable belief that securities statutes and regulations were violated directly with the SEC staff, first with Office of Credit Ratings ("OCR") and later with the Office of the Whistleblower and the Division of Enforcement.

3.   As a direct result of their good faith reports of potential violations of federal securities law, Plaintiffs were repeatedly harassed and threatened with demotion and termination of their employment at Egan-Jones.  After Plaintiffs had submitted their formal whistleblower complaints to the SEC, Egan-Jones terminated Plaintiffs' employment using the false pretense of a reorganization, when in fact the terminations constituted retaliation for their lawful reports of illegal conduct they had observed at Egan-Jones.

4.   In this lawsuit, Plaintiffs seek compensatory damages and all other legal relief permitted under the Dodd-Frank Act and New York Labor Law.

## **PARTIES**

5.   Plaintiff Michael Brawer is an individual residing in New Jersey.  From November 2019 until his unlawful termination in January 2024, Mr. Brawer served as the Designated Compliance Officer and Chief Risk Officer of Egan-Jones, assigned to its offices in New York, NY and Haverford, PA.

6.   Plaintiff Philip Galgano is an individual residing in New Jersey.  From January 2020 until his unlawful termination in January 2024, Mr. Galgano served as a Senior Director and Head of Ratings of Egan-Jones, assigned to its office in New York, NY.

7.   Defendant Egan-Jones Ratings Company is a privately-owned rating agency.  Egan-Jones is incorporated in Delaware and maintains an office and conducts substantial business operations in New York, NY.  Egan-Jones was Plaintiffs' "employer" within the meaning of New York law and within the meaning of the Dodd-Frank Act and all other applicable laws.

8.   Defendant Sean Egan is the founder, sole shareholder, and chief executive officer of Egan-Jones.  Egan is the former chairman of Egan-Jones's board of directors, conducting business in New York, NY.

9.   Nonparty Wenrong Hu was a senior employee of Egan-Jones, conducting business in New York, NY.  Until her resignation on or about August 8, 2023, Hu served as the Director of Operational Development and as Chief Operating Officer, reporting directly to Egan. Until the hiring of a Head of Human Resources in or around May 2023, Hu was also responsible for the human resources function at Egan-Jones.  Hu and Egan are married.

**JURISDICTION AND VENUE**

10. This action arises under the Dodd-Frank Act, 15 U.S.C. § 78u-6(h)(1)(B)(i). Accordingly, this Court has original jurisdiction over this action pursuant to 28 U.S.C. § 1331 since this matter is founded on the existence of a federal question.[1]

11. Jurisdiction over Defendants, and each of them, exists because Egan-Jones is present and operates an office within the jurisdictional limits of New York, NY and the judicial jurisdiction

---

[1] Plaintiffs reserve the right to pursue an additional claim under the anti-retaliation provision of the Sarbanes-Oxley Act of 2002 ("SOX"), 18 U.S.C. § 1514A(b)(1)(B), after exhausting Plaintiffs' administrative remedies under SOX.

of this Court.  Nearly all of Egan-Jones's activity involving interaction with clients and regulators takes place in Egan-Jones's office located in New York, NY, and Egan-Jones's policies recognize that it is "subject [to] . . .  state and local laws of each of EJR's offices."  In addition, Egan-Jones is examined annually by a team of examiners from the New York Regional Office of the SEC, and some of Plaintiffs' internal and external reports of wrongdoing that give rise to this Complaint took place at Egan-Jones's office in New York, NY.  Egan traveled to New York for in-person meetings of the board of directors, including the September 2023 meeting in which one of the Plaintiffs reported concerns regarding potential violations of federal securities law before he was terminated.

12. This Court has pendent jurisdiction over related state law claims under 28 U.S.C. § 1367(a).

13. Venue is proper in the Southern District of New York pursuant to 28 U.S.C. § 1391(b)(2) because substantial occurrences giving rise to this Complaint occurred in this District.

## STATEMENT OF FACTS

### A. BACKGROUND

### I. As a Nationally Recognized Statistical Rating Organization, Egan-Jones is Statutorily Required to Manage Conflicts of Interest

14. Egan-Jones is a nationally recognized statistical rating organization ("NRSRO") registered with the SEC under Section 15E of the Securities Exchange Act of 1934 ("Exchange Act") for certain asset classes.

15.  The Exchange Act, as amended by the Dodd-Frank Act, and SEC rules promulgated thereunder impose certain requirements on NRSROs, including as to governance and the maintenance of effective controls to eliminate conflicts of interest.

a. <u>Conflicts of interest</u>:   The Dodd-Frank Act directed the SEC to "issue rules to prevent the sales and marketing considerations of a [NRSRO] from influencing the production of ratings by the [NRSRO]." *See* 15 U.S.C. § 78o-7(h)(3)(A).  The SEC adopted Rule 17g-5 of the Securities Exchange Act of 1934 ("Rule 17g-5") for the purpose of insulating rating analysts from business pressures by separating rating agencies' business-development function from their analytical function.[2]

b. <u>Effective Controls</u>: Section 15E(h)(1) of the Exchange Act requires an NRSRO to establish, maintain, and enforce written policies and procedures reasonably designed to address and manage any conflicts of interest that can arise from such business. 15 U.S.C. § 78o-7(h)(1).

c. <u>Designated Compliance Officer</u>: Section 15E(j)(1) of the Exchange Act requires an NRSRO to designate a compliance officer responsible, among other things, for administering the policies and procedures of the NRSRO established pursuant to section 15E(h) of the Exchange Act (to address and manage conflicts of interest) and for ensuring compliance with all applicable securities laws, rules, and regulations. 15 U.S.C. § 78o-7(j)(1).

d. <u>Annual Examinations</u>: Sections 932(a)(8) and (a)(4) of the Dodd-Frank Act, respectively, amended Section 15E of the Exchange Act to require the OCR to conduct annual examinations of NRSROs to review the management of conflicts of

---

[2] Rule 17g-5(c) states that an NRSRO "is prohibited from having the following conflicts of interest relating to the issuance or maintenance of a credit rating as a credit rating agency . . . . (8) The [NRSRO] issues or maintains a credit rating where a person within the [NRSRO] who participates in determining or monitoring the credit rating, or developing or approving procedures or methodologies used for determining the credit rating, including qualitative and quantitative models, also: (i) Participates in sales or marketing of a product or service of the [NRSRO] or a product or service of an affiliate of the [NRSRO]; or (ii) is influenced by sales or marketing considerations." *See* 17 CFR § 240.17g-5.

interest, internal controls, governance, and implementation of its policies, procedures, and rating methodologies. *See* 15 U.S.C. § 78o-7(p)(3); 15 U.S.C. § 78o-7(h)(4)(B). Examination findings that, in the view of the SEC staff, rise to the level of "material regulatory deficiencies" are identified in the annual inspection report to Congress. *See* 15 U.S.C. § 78o-7(p)(3)(C).

16. Pursuant to the above-referenced statutory and regulatory requirements, Egan-Jones is obligated to maintain written policies and procedures reasonably designed to address and manage any conflicts of interest, and Egan-Jones issued "Policies and Procedures to Address and Manage Conflicts of Interest," which among other things:

a. Define a series of "prohibited conflicts" in a manner derived from Rule 17g-5(c), which include any effort to "Issue or maintain a credit rating where a person within the Firm who participates in determining or monitoring the credit rating, or developing or approving procedures or methodologies used for determining the credit rating, including qualitative and quantitative models, also: (i) Participate in sales or marketing of a product or service of the Firm or a product or service of an affiliate of the Firm; or (ii) Is influenced by sales or marketing considerations."

b. Require those who "observe or become aware of any conduct that you believe is unethical or improper" to "communicate that information to the Firm's ownership, compliance officer (DCO), counsel, or to the 24-hour independently operated helpline."

c. Prohibit retaliation for reports or complaints regarding the misconduct of others. Specifically, "The firm prohibits and will not tolerate any kind of retaliation or

retribution for reports or complaints (internally or via the independent helpline)

regarding firm misconduct or the misconduct of others that were made in good faith."

## II. Egan-Jones Settles SEC Charges That It Violated Statutory and Regulatory Conflict-of-Interest Provisions

17. On June 21, 2022, Egan-Jones and Egan settled an SEC enforcement proceeding

following a multi-year investigation. *See In the Matter of Egan-Jones Rating Company and*

*Sean Egan*, Release No. 34-95127 (June 21, 2022) (hereinafter the "SEC Order").  The SEC

allegations underlying the SEC Order spanned the time period of 2016 through mid-2019.

18. According to the allegations contained in the SEC Order, which Egan-Jones and Egan

settled without admitting or denying, Egan-Jones and Egan violated several statutory and

regulatory conflict-of-interest provisions, including:

a. Egan-Jones violated Rule 17g-5(c)(8)(i) by issuing and maintaining a credit rating for

a client where Egan had participated in determining the credit rating at issue and

engaged in sales and marketing activities with respect to that client.  SEC Order ¶ 1.

b. Egan-Jones violated Rule 17g-5(c)(8)(ii) because Egan had been influenced by sales

or marketing considerations at the time that he participated in determining the credit

rating.  SEC Order ¶ 1.

c. Egan-Jones violated Rule 17g-5(c)(1), a conflict-of-interest rule that prohibits an

NRSRO from issuing or maintaining a credit rating solicited by a person who, in the

most recently ended fiscal year, provided the NRSRO with net revenue equaling or

exceeding ten percent of the total net revenue of the NRSRO for that fiscal year.  SEC

Order ¶ 2.

    d.  Egan-Jones violated Section 15E(h)(1) of the Exchange Act because it failed to establish, maintain, and enforce policies and procedures reasonably designed to manage conflicts of interest.  SEC Order ¶ 3.

    e.  Egan caused Egan-Jones's violation of Rules 17g-5(c)(8)(i) and (ii).  SEC Order ¶ 1.

19. Among the remedies embodied in the SEC Order,

    a.  Egan-Jones agreed to "prohibit Egan from participating directly or indirectly in (a) determining or monitoring any credit rating issued or maintained by Egan-Jones or (b) developing or approving procedures or methodologies used for determining credit ratings issued or maintained by Egan-Jones, including qualitative and quantitative models."  SEC Order ¶ 69.

    b.  Egan-Jones agreed to engage an independent consultant (the "Independent Consultant"), who would be required to conduct a comprehensive review of Egan-Jones's written policies and procedures intended to address and manage conflicts of interest and issue a report concerning the relevant findings.  SEC Order ¶ 68.

    c.  Sixty days following the receipt of the Independent Consultant's final report, the chief executive officer and Designated Compliance Officer of Egan-Jones were required to certify in writing, under penalty of perjury, that Egan-Jones complied with its obligations under the SEC Order.  SEC Order ¶ 72.

20. On June 29, 2022, pursuant to Paragraph 69 of the SEC Order and "to supplement the firm's existing policies and procedures designed to address the restrictions set forth in Rule 17g-5," Egan-Jones implemented its Roles and Responsibilities Limitations: Supplemental Policies and Procedures ("Roles and Responsibilities Limitations") which were intended to limit the roles of Egan and family members.  Under the policy, Egan and his family members employed at

Egan-Jones "shall be prohibited from participating directly or indirectly, regardless of capacity, in (a) determining or monitoring any credit rating issued or maintained by the firm or (b) developing or approving procedures or methodologies used for determining credit ratings issued or maintained by the firm, including qualitative and quantitative models."  In addition to these general prohibitions, the Roles and Responsibilities Limitations also spelled out more specific prohibitions on conduct involving credit ratings, credit rating methodologies, and credit models. The Roles and Responsibilities Limitations also required the Designated Compliance Officer to report periodically to Egan-Jones's board of directors on compliance with the prohibitions contained in the policy.

21. On August 1, 2022, pursuant to Paragraph 68 of the SEC Order, Egan-Jones retained Richard H. Girgenti (d/b/a IDPL Consulting, LLC) as the Independent Consultant and K2 Integrity to support the work of the Independent Consultant.  On December 18, 2022, pursuant to Paragraph 68(b)(iv) of the SEC Order, the Independent Consultant submitted an initial report to Egan-Jones's board of directors and senior management and to the SEC.  On August 25, 2023, pursuant to Paragraph 68(b)(vi) of the SEC Order, the Independent Consultant submitted a final report to Egan-Jones and to the SEC.

**III. Egan-Jones Hires Plaintiffs After Settling Earlier SEC Charges That It Violated Statutory and Regulatory Conflict-of-Interest Provisions**

22. Both Plaintiffs were initially hired by Egan-Jones after the alleged violations of law underlying the SEC Order occurred and as part of Egan-Jones's purported efforts to improve its controls pertaining to the management of conflicts of interest in compliance with SEC expectations and applicable law as ultimately embodied in the SEC Order.

i. <u>Egan-Jones Hires Mr. Brawer</u>

23. Egan-Jones hired Mr. Brawer in November 2019 as the Designated Compliance Officer and Chief Risk Officer.  Mr. Brawer was hired to strengthen Egan-Jones's Compliance function during the SEC investigation into Egan-Jones's potential violation of SEC rules designed to manage conflicts of interest by NRSROs.  Mr. Brawer replaced a predecessor who was terminated shortly after Mr. Brawer's start date with Egan-Jones.

24. As the Designated Compliance Officer, pursuant to Section 15E(j)(1) of the Exchange Act, Mr. Brawer was responsible for monitoring the compliance of Egan-Jones with applicable securities laws, rules, and regulations, administering the policies and procedures of Egan-Jones established, among other things, pursuant to Section 15E(h) of the Exchange Act (to address and manage conflicts of interest), and detecting and reporting material compliance failures.

25. Mr. Brawer supervised approximately five Compliance professionals (including employees and contractors) and reported to the board of directors, including Egan.  Mr. Brawer's salary was set by Hu in consultation with the Independent Directors.

ii. <u>Egan-Jones Hires Mr. Galgano</u>

26. Egan-Jones hired Mr. Galgano in January 2020 as a Senior Director, and he was later promoted to Head of the Ratings analytical function.  Mr. Galgano was hired as part of the purported efforts by Egan-Jones to address the series of deficiencies identified by the SEC regarding how Egan-Jones managed conflicts of interest.  Specifically, Mr. Galgano was hired to separate Egan's previously overlapping ownership, business development, and ratings analytical roles.  Soon after Mr. Galgano joined Egan-Jones, Egan was supposed to separate himself from any responsibilities for the ratings analytical function.

27. As the Head of the Ratings analytical group, Mr. Galgano was committed to adhering to Egan-Jones's established procedures and methodologies for determining credit ratings and keeping analytical decisions free from prohibited conflicts of interest.

28. Mr. Galgano oversaw approximately 26 analysts (including employees and contractors) responsible for issuing Egan-Jones's credit ratings.  Mr. Galgano reported to Egan.

## B.  EGAN-JONES'S ONGOING VIOLATIONS OF LAW IN THE RATINGS PROCESS

29. Plaintiffs accepted their positions at Egan-Jones based upon representations by Egan and others that Plaintiffs would hold important responsibilities and authority to strengthen and maintain compliance at Egan-Jones with federal statutes, rules, and relevant policies.  Upon joining Egan-Jones, Plaintiffs made efforts so that Egan-Jones would issue high-quality ratings not subject to commercial influence.

30. In contravention of their expectations, Plaintiffs repeatedly observed conduct at Egan-Jones that Plaintiffs actually and reasonably believed constituted violations of federal securities laws and regulations governing NRSROs, including but not limited to Section 15E(h)(1) of the Exchange Act, Rule 17g-5(c), and the SEC Order.  Such violations, which are described in greater detail below, included at least the following: (1) Egan's and Hu's application of business pressure on analytical staff to alter indicative ratings in order to induce customers to engage Egan-Jones to issue final ratings; (2) Egan's and Hu's application of business pressure on analytical staff to change Egan-Jones ratings to create the false appearance of more accurate Egan-Jones ratings when compared with the ratings of other rating agencies; (3) Egan's and Hu's violation of Egan-Jones's policies established to manage conflicts of interest in connection with rating actions; (4) Egan's and Hu's application of business pressure on analytical staff to downgrade credit ratings within the banking sector; (5) Egan's and Hu's knowing

misrepresentations to SEC staff regarding Hu's role; and (6) the existence of a points system for rating analysts that interjected sales and marketing considerations into the ratings analytical process.

### I.   Business Pressure on Analysts to Provide Favorable Indicative Ratings to Potential Clients

31. One of the lines of business at Egan-Jones is the provision of private credit ratings for private transactions of individual clients.  At times, Egan-Jones initially offers preliminary "indicative" ratings feedback to potential clients.  If the potential client, after obtaining the preliminary rating feedback, proceeds to engage Egan-Jones on the private transaction, the client obtains a formal "final" credit rating from Egan-Jones for the transaction.

32. In 2021, the Ratings analytical team was asked to provide an indicative rating on a certain private real estate transaction.  Pursuant to standard operating procedures, at first the analysts calculated a preliminary rating for the transaction based on Egan-Jones's analytic model.  Then, after conducting research on the subject property, the analysts elected to move down the indicative rating from the earlier model-implied rating in order to reflect certain negative attributes of the surrounding geographic area that were not captured by the analytic model.  The team of analysts then provided the indicative rating to the potential client.

33. Shortly thereafter, Egan called Mr. Galgano and stated that the client was not happy with the indicative rating and had complained to Egan.  Egan asked Mr. Galgano to explain why the indicative rating was moved down from the higher model-implied rating.  Egan pressured Galgano to provide the potential client with the higher model-implied indicative rating, rather than a lower rating that the rating committee members believed accounted for certain negative qualitative attributes of the subject property. Mr. Galgano declined to do as asked.  Mr. Galgano understands that potential client did not move forward with Egan-Jones for a final rating.

34. Subsequently, in or about October 2021, in a weekly management meeting, which included Mr. Galgano, Hu, and Egan, Hu remarked in sum and substance that not enough of Egan-Jones's potential clients that had received indicative ratings were engaging Egan-Jones to issue final ratings and Hu pressured Mr. Galgano to contact multiple potential clients that had received indicative ratings from Egan-Jones (but had not engaged Egan-Jones to provide a final rating) and to offer to provide them with an updated (i.e., higher) indicative rating.

35. At the meeting, Mr. Galgano refused Hu's request because Hu sought to inject business influence into the analytical process in violation of Rule 17g-5(c)(8)(ii) and Egan-Jones "Policies and Procedures to Address and Manage Conflicts of Interest." Mr. Galgano warned Hu at the meeting that Hu was "crossing the line" of permissible conduct.

## II. Business Pressure on Analysts to Change Subscription Ratings to Align with Those of Other Rating Agencies

36. In addition to private ratings, Egan-Jones offers unsolicited ratings on public companies' credit quality on a subscription basis. Egan-Jones has a longstanding practice of publishing an annual Hits and Misses report which "aims to measure the extent to which the major rating firms converge toward [Egan-Jones's] rating" for public companies. *See* https://www.Egan-Jones.com/about-us/company-overview/. Credit ratings of public companies by other rating agencies (principally, Standard & Poor's and Moody's) that move toward an Egan-Jones rating of the same companies are characterized as a "hit"; a move away is characterized as a "miss." Egan-Jones uses the Hits and Misses report, among other things, for marketing purposes. *See id.* ("Egan-Jones' accuracy has been proven by our record of Hits and Misses").

37. Historically, the "hit" rate on the Hits and Misses report was over 90%. After Mr. Galgano joined Egan-Jones in 2020, and Egan purported to separate himself from analytical

decisions, Egan-Jones's "hit" rate came down as analysts under Mr. Galgano's supervision followed Egan-Jones's analytical models with greater consistency.

38. As a result of the reduced "hit" rate, Egan and Hu instructed analytical staff to produce a greater number of "hits" for the purpose of the Hits and Misses report.  For example, in or about March 2022, Egan called Mr. Galgano and complained that the Hits and Misses report contained a "hit" rate of 83%.  After Mr. Galgano refused to modify any ratings or the ratings process in order to generate a greater number of "hits," Egan demanded a "solution" to increase the "hit" rate to above 90%.  In or about March 2022, Hu also complained to two rating analysts that the "hit" rate was at an all-time low.  Egan and Hu continued to raise concerns regarding the Hits and Misses report in conversations with Mr. Galgano and analytical staff.

39. Mr. Galgano actually and reasonably believed that Egan's and Hu's desire to maintain a high "hit" rate represented improper business pressure on analysts that constituted a likely violation of Rule's 17g-5(c)(8)(ii) and Egan-Jones's "Policies and Procedures to Address and Manage Conflicts of Interest."

### III. Violation of Conflict-of-Interest Rules in Connection with an Individual Private Rating

40. Under Egan-Jones's procedures intended to promote compliance with SEC Rule 17g-5, no meetings or phone calls may take place with clients that simultaneously involve both sales and analytical personnel of Egan-Jones.  Specifically, Paragraph 9 of Egan-Jones's Marketing and Billing Procedures ("Marketing Procedures") permits both commercial staff and analytical staff to communicate together with a client for an introductory purpose, but not to both remain at the meeting for the substance of the discussion.  No pricing or specific rating methodology may be discussed while both commercial staff and analytical staff are present on the client call.

41. On September 21, 2022, a telephonic meeting about a potential new transaction was arranged with an Egan-Jones client that included both analytical and commercial staff of Egan-Jones. Mr. Brawer and a colleague from Compliance joined the call to monitor compliance with applicable law and Egan-Jones's Marketing Procedures.

42. Consistent with the Marketing Procedures, after introductory remarks, Mr. Brawer asked the representative of Egan-Jones's commercial staff to leave the telephone call. However, Hu contradicted Mr. Brawer and insisted that the representative of Egan-Jones's commercial staff remain on the call with the analytical staff.

43. Mr. Brawer stayed on the call to continue monitoring, but one of the analysts present on the call dropped off the telephonic meeting and immediately submitted a written complaint to Mr. Brawer that Hu had engaged in sales and marketing activities during the call on which analysts were present.

44. Later in the day, Mr. Brawer advised Hu of the analyst's complaint, with a copy to Egan and the general counsel. Mr. Brawer reminded Hu to comply with the Marketing Procedures and indicated that he would investigate the analyst's allegations. Mr. Brawer also reminded Hu of the importance of complying with Egan-Jones's policies.

45. On September 26, 2022, Mr. Brawer emailed the analytical staff, including Mr. Galgano, to advise that, as a remedial measure, the two analysts who attended the September 21, 2022 call with the client should not be involved in the subject rating for a period of 12 months.

46. On September 29, 2022, after an investigation, Mr. Brawer issued a memorandum which concluded that although Hu did not violate Rule 17g-5(c)(8) because no commercial terms were discussed on the call, Hu violated the Marketing Procedures.

47. Hu's violation of the Marketing Procedures impeded Egan-Jones's compliance with Section 15E(h)(1) of the Exchange Act, which requires an NRSRO to establish, maintain, and enforce written policies and procedures reasonably designed to address and manage any conflicts of interest and also inhibited Mr. Brawer ability to fulfill his statutory responsibility pursuant to Section 15E(j)(1) of the Exchange Act.

48. As described in greater detail in ¶¶ 121-124, in retaliation for Mr. Brawer's efforts to enforce Egan-Jones's conflict-of-interest policies and report and investigate Hu's violation of the same, Hu repeatedly threatened Mr. Brawer's career.

**IV. Business Pressure on Analysts to Downgrade Credit Ratings Within the Banking Sector**

49. In the spring of 2023, following the failure of several large banks, Egan and Hu engaged in concerted efforts to compel the analytical staff to downgrade Egan-Jones's credit ratings in the banking sector in violation of conflict-of-interest regulations, the SEC Order, and Egan-Jones's compliance policies.

i. Events of March 2023

50. On or about March 8, 2023, Silicon Valley Bank ("SVB") publicly announced that it would book a $1.8 billion loss after selling some of its investments to cover increasing withdrawals.  Shortly thereafter, Moody's downgraded SVB's parent company, SVB Financial Group.  On or about March 9, 2023, SVB's stock price fell by a substantial amount, and a growing number of SVB's clients sought to withdraw funds from the bank.

51. On March 10, 2023, U.S. regulators seized control of SVB, and the ratings analytical staff at Egan-Jones placed SVB Financial Group on "credit watch."

52. On March 11, 2023, which was a Saturday, Egan and Hu telephoned Mr. Galgano and expressed concern that the analytical staff had not downgraded SVB Financial Group.  Mr.

Galgano explained that any rating action required a credit basis pursuant to Egan-Jones's analytical criteria and that no such analytical grounds existed at that time, *i.e.*, no new data or event had taken place to cause a ratings downgrade of SVB Financial Group pursuant to Egan-Jones's analytical criteria.  Egan and Hu instructed Mr. Galgano that the analytical staff were required to take a ratings action before the morning of Monday, March 13, 2023.

53. On March 11, 2023, Egan and Hu also telephoned Mr. Brawer and directed Mr. Brawer to circumvent Mr. Galgano and instead to communicate directly with analytical staff supervised by Mr. Galgano.  In response, Mr. Brawer stated that he would refuse to withhold from Mr. Galgano, as head of the analytical team, any matters having a material impact on the work of the analytical team.

54. On March 12, 2023, Hu telephoned Mr. Brawer and directed him to contact analytical staff and to instruct them that they should cease updating bank credit ratings based solely on their own analytical judgment and should review information conveyed by the general counsel of Egan-Jones regarding any further bank ratings actions.  Mr. Brawer stated that he would not provide these instructions to analytical staff because such an instruction would violate SEC Rule 17g-5. Hu abruptly ended the call.

55. Also on March 12, 2023, Mr. Galgano learned from certain Egan-Jones analysts that Hu had called them and instructed them regarding how and with whom to hold bank rating committees, and that Hu instructed the analysts not to discuss these analytical matters with Mr. Galgano.

56. Subsequently, Egan-Jones downgraded the rating of SVB Financial Group, based upon the judgment of Egan-Jones analysts that its bankruptcy was forthcoming.  SVB Financial Group

filed for Chapter 11 bankruptcy protection on March 17, 2023.  *See In re: SVB Financial Group*, Case No. 23-10367-mg (S.D.N.Y. Bankr.).

ii. <u>Events of May 2023</u>

57. On May 1, 2023, federal regulators took over First Republic Bank and immediately sold it to JPMorgan Chase.  At or around this time, Egan and Hu engaged in additional efforts to effect an across-the-board downgrade of the banking sector by Egan-Jones analysts.

58. On or about May 5, 2023, Hu telephoned Mr. Galgano and stated that the analytical staff needed to take downward rating actions in the banking sector and that Mr. Galgano needed to convene a ratings committee to effect such downgrades.  Mr. Galgano rejected Hu's instruction and stated, as before, that any rating action required a credit basis pursuant to Egan-Jones's analytical criteria and that no such analytical grounds existed at that time.

59. On or about May 5, 2023, Mr. Galgano was informed by an analyst that Egan had called the analyst and communicated concern that Egan-Jones might be sued in the future, upon any bankruptcy of any rated bank, if Egan-Jones did not immediately downgrade its rating of all banks below investment grade.  Egan communicated to the analyst that placing banks on "credit watch" was deemed to be unacceptable to the board of directors of Egan-Jones.  The analyst understood, and conveyed to Mr. Galgano that the analyst understood, Egan to be applying pressure for the analyst to take an immediate negative rating action.  Upon information and belief, Egan conducted similar conversations with no fewer than three other analysts.

60. On May 5, 2023, Egan telephoned Mr. Galgano and emphasized that Egan-Jones analytical staff must "stay on top of market conditions."  In the context of Hu's earlier call to Mr. Galgano, and informed of Egan's earlier call to an analyst, Mr. Galgano understood Egan to be pressuring the analytical staff to downgrade ratings in the banking sector.

61. On May 5, 2023, Mr. Galgano convened a ratings committee of analytical staff and explained that rating actions could only be taken based on credit events consistent with Egan-Jones's analytical criteria.  The ratings committee determined to downgrade certain credit ratings in the banking sector but declined to make the sector-wide downgrades below investment grade that Egan and Hu had pressured to occur.

62. Mr. Brawer and Mr. Galgano each believed actually and reasonably that Egan's and Hu's pressure on analysts to downgrade credit ratings in the banking sector, both in March and in May, violated at least Rule 17g-5, the SEC Order, and Egan-Jones's policies.  Accordingly, as discussed below (*see* ¶¶ 78-119), Plaintiffs separately reported their concerns about these violations internally within Egan-Jones and externally to the SEC.  As discussed further below (*see* ¶¶ 120-139), Egan and Hu retaliated against Plaintiffs for their reports of misconduct.

**V. <u>Misrepresentations to SEC Staff Regarding Hu's Role</u>**

<u>i. The Investigation of Hu's Misrepresentation to the SEC</u>

63. On or about June 13, 2023, Hu directed Egan-Jones's head of Information Technology (the "IT executive") to falsely inform SEC staff, to the extent the SEC staff were to make an inquiry during an examination interview, that Hu did not manage the IT executive.  Although the SEC examination team did not inquire on the subject and the IT executive did not make any misrepresentation, the IT executive filed an internal complaint to Compliance regarding Hu's instruction, which was referred to outside counsel for investigation.

64. On or about June 16, 2023, Egan-Jones placed Hu on administrative leave pending the conclusion of the internal investigation by outside counsel.

65. As discussed below, Mr. Brawer immediately reported the allegation and the commencement of the investigation to the OCR examination team.  Mr. Brawer actually and

reasonably believed that Hu's instruction to the IT executive (i) constituted fraud on the regulator, and (ii) circumvented Egan-Jones's internal control structure that is established, pursuant to Section 15E of the Exchange Act, to ensure compliance with federal securities laws and regulations.

## ii. Egan-Jones Further Misrepresented Hu's Role to the SEC

66. As a result of the investigation of Hu's misrepresentation to the SEC, Hu nominally resigned from her position at Egan-Jones on or about August 9, 2023.  On the same day, Egan-Jones's general counsel informed the SEC staff of Hu's resignation.

67. On or about August 10, 2023, Egan and the general counsel announced Hu's termination to the analytical staff of Egan-Jones but stated that Hu would continue to provide unspecified "guidance and direction" to Egan-Jones.

68. On or about October 23, 2023, an Egan-Jones sales manager called Mr. Brawer to express concern that a certain operations manager at Egan-Jones shared during that day's internal meeting that the operations manager was acting on a matter at the direction of Hu, demonstrating that Hu remained involved in Egan-Jones even following her resignation.

69. On November 26, 2023, a former employee of Egan-Jones received an anonymous text message from a Philadelphia-region area code communicating a desire to recruit the former employee to return to Egan-Jones for a compliance officer position.  The unwillingness of the sender to identify him or herself except as a member of the "recruit team," the particular writing style, and the Philadelphia region area code caused Mr. Brawer to suspect that the message was sent by Hu.  On November 28, 2023, Mr. Brawer discussed the text message with Egan-Jones's sole Human Resources employee who stated that she was not aware of, nor would she have approved of, the text message to the former employee.

70. On December 18, 2023, Mr. Galgano discussed a candidate for an analytical position with the Head of Human Resources at Egan-Jones.  The Head of Human Resources informed Mr. Galgano that she had spoken to an external executive recruiter for Egan-Jones concerning a certain candidate, and the executive recruiter stated that "Wen really liked" the candidate.  The search for the role had commenced in or about September 2023, and Mr. Galgano understood the recruiter to be conveying that the candidate had been vetted by Hu subsequent to Hu's termination of employment from Egan-Jones on or about August 9, 2023.

71. As discussed below, Mr. Brawer and Mr. Galgano separately reported to the SEC the misrepresentation involving Hu because they actually and reasonably believed that Hu's concealed role (i) constituted fraud on the regulator, and (ii) circumvented Egan-Jones's internal control structure that is established, pursuant to Section 15E of the Exchange Act, to ensure compliance with federal securities laws and regulations.

### VI. Points System for Rating Analysts that Interjected Sales and Marketing Considerations into the Ratings Process

72. Since at least July 2020, at the urging of Hu, Egan-Jones maintained a system to measure the productivity of its analytical staff (hereinafter, the "points system").

73. Under the points system, analysts earned points for completing certain rating activities and were required to accrue at least 40-points per week.  Points were not earned for a deal on which Egan-Jones did not issue a rating, regardless of the amount of time spent by the analyst on the deal, and the points earned did not align with the amount of work involved.

74. Mr. Galgano actually and reasonably believed that the points system interjected sales and marketing considerations improperly into the ratings process in violation of Rule 17g-5(c)(8) and Egan-Jones's policies.  As described below, Mr. Galgano shared his concerns internally at Egan-Jones and communicated them with the SEC staff in May 2023.

75. In late September 2023, after the SEC staff concluded in an examination letter that the existence of points system constituted a material regulatory deficiency, Mr. Brawer investigated the points system further and discovered that Egan-Jones made $100 - $300 monthly "award" payments to analysts based on the points system and outside of the ordinary-course annual salary and annual bonus compensation practices of Egan-Jones.  Mr. Brawer's review of the board minutes demonstrated that Hu did not share information about these monthly award payments during board meetings in which members of the board were supposed to oversee Egan-Jones's compensation and promotion policies and practices.

76. Mr. Brawer actually and reasonably believed that Hu's failure to inform the board of directors about the points system and "award" payments violated Section 932 of the Dodd-Frank Act, which requires a NRSRO's board of directors to oversee "the compensation and promotion policies and practices" of the NRSRO.  *See* 15 U.S.C. 78o-7(t)(3)(D).  Because Hu failed to disclose the points system to the board of directors, the board was unable to provide effective oversight in a manner required by the Dodd-Frank Act.

77. In addition, Mr. Brawer actually and reasonably believed that the practice interjected sales and marketing considerations improperly into the ratings process in violation of Rule 17g-5(c)(8).  In Mr. Brawer's reasonable belief, the practice also violated internal Egan-Jones policies designed to put the above rules into effect.  As described in ¶ 114, Mr. Brawer reported his concerns about the awards payment to the SEC, and, on October 2, 2023, Mr. Brawer instructed the director of Accounting to eliminate the practice from Egan-Jones's payroll systems.

### C. PLAINTIFFS REPORTED WHAT THEY ACTUALLY AND REASONABLY BELIEVED TO BE VIOLATIONS OF LAW AT EGAN-JONES

78. Plaintiffs repeatedly raised concerns about what they actually and reasonably believed to be violations of applicable securities laws and regulations to internal and external stakeholders.

79. Specifically, Plaintiffs raised their concerns contemporaneously with executive management and in-house counsel at Egan-Jones on multiple occasions between 2021 and 2023. When Egan-Jones's executive management failed to address Plaintiffs' concerns, Plaintiffs also raised their concerns directly with the board of directors and with outside counsel hired by the board to conduct an internal investigation into certain potential violations. Plaintiffs also communicated their concerns in interviews with the Independent Consultant hired pursuant to the SEC Order. Finally, Plaintiffs reported their concerns to the SEC, including the OCR, the Office of the Whistleblower, and the Division of Enforcement.

### I. Plaintiffs' Reports to Executive Management and In-House Counsel

80. Plaintiffs, actually and reasonably believed that by engaging in the conduct described above, Egan and Hu had violated Section 15E of the Exchange Act, Rule 17g-5, the SEC Order, and Egan-Jones's compliance policies. Accordingly, Plaintiffs contemporaneously and repeatedly objected to Egan's and Hu's improper instructions and refused to participate in such conduct.

81. In or about October 2021, in connection with Hu's pressure on analysts to alter indicative ratings for prospective clients (*see* ¶¶ 31-35), Mr. Galgano refused Hu's request to contact clients to offer to provide an updated (i.e., higher) indicative rating as Hu requested. Mr. Galgano believed that Hu sought to improperly inject business influence into the analytical process in violation of 17g-5(c)(8)(ii). Mr. Galgano told Hu that she was "crossing the line" of appropriate conduct.

82. On or about March 9, 2022, in connection with Egan's pressure to increase the "hits" rate (*see* ¶¶ 36-39), Mr. Galgano rejected Egan's request.  Believing that Egan's conduct was a likely violation of Rule 17g-5(c)(8)(ii), Mr. Galgano responded to Egan that he would not allow ratings determinations by the analytical staff to be influenced by Egan's desire to achieve a particular result in the Hits and Misses report.

83. On or about September 21, 2022, in connection with Hu's insistence earlier that day that a representative of Egan-Jones's commercial staff remain on a call with the analytical staff and a client (*see* ¶¶ 40-48), Mr. Brawer initiated an investigation into the allegation that Hu violated the Marketing Procedures.  Later the same day, Mr. Brawer informed Egan (with Hu present on the call) that Hu had willfully violated, and had instructed the representative of Egan-Jones's commercial staff to violate, the Marketing Procedures.  On or around September 29, 2022, Mr. Brawer issued a memorandum concluding after an investigation that Hu violated the Marketing Procedures.  The violation of the Marketing Procedures also violated Section 15E(h)(1) of the Exchange Act, which requires an NRSRO to establish, maintain, and enforce written policies and procedures reasonably designed to address and manage any conflicts of interest, and the violation inhibited Mr. Brawer ability to fulfill his statutory responsibility in Section 15E(j)(1) of the Exchange Act.

84. Mr. Galgano and Mr. Brawer both objected contemporaneously to Egan's and Hu's efforts to downgrade Egan-Jones's credit rating of SVB Financial Group (*see* ¶¶ 50-56).  On Saturday, March 11, 2023, in response to a request to downgrade SVB Financial Group by morning of Monday, March 13, 2023, Mr. Galgano explained to Egan and Hu that any rating action required a credit basis pursuant to Egan-Jones's analytical criteria and that no such analytical grounds existed at that time, *i.e.*, no new data or event had taken place to cause a

ratings downgrade of SVB Financial Group pursuant to Egan-Jones's analytical criteria.  When Egan and Hu telephoned Mr. Brawer the same day and directed Mr. Brawer to circumvent Mr. Galgano and instead to communicate directly with analytical staff supervised by Mr. Galgano, Mr. Brawer refused to withhold from Mr. Galgano, as head of the rating analytical team, any matters having a material impact on the work of the analytical team.

85. On Sunday, March 12, 2023, when Hu telephoned Mr. Brawer and directed him to instruct analytical staff to cease updating bank credit ratings solely in accordance with the judgment of the analytical staff and to review information conveyed by the general counsel of Egan-Jones regarding any further ratings actions, Mr. Brawer stated contemporaneously that he would not provide these instructions to analytical staff due to the requirement that Egan-Jones maintain the integrity of its ratings process.  Hu abruptly ended the call.

86. On or about March 13, 2023, Mr. Brawer expressed repeated concerns during a meeting that included analytical staff, Mr. Brawer, Egan and Hu that Egan's conduct would violate Rule 17g-5(c)(8) because Egan was directing a discussion pertaining to the analysis of credit ratings during the meeting, while holding a business role.  In response, Egan stated that he refused to comply with Mr. Brawer's advice not to discuss analytical matters with analytical staff.

87. On or about May 5, 2023, Mr. Galgano objected when Hu insisted that the analytical staff downgrade ratings in the banking sector (*see* ¶¶ 57-62) because Mr. Galgano believed that Hu sought to inject business influence improperly into the analytical process in violation of 17g-5(c)(8)(ii).

88. On August 28, 2023, Brawer informed Egan that he was unable in good faith to fulfill his obligation under the SEC Order to certify under penalty of perjury that Egan-Jones has complied with all aspects of the SEC Order in view of his conclusion that Egan violated 17-g5(c)(8)

directly and also indirectly (through Hu) by pressuring analysts to downgrade ratings in the banking sector in May 2023.

89. In connection with Hu's pressure to follow the points system (*see* ¶¶ 72-77), Mr. Galgano on multiple occasions, including at the weekly management meetings, objected to Hu and expressed his view that the points system was not an appropriate manner in which keep track of ratings analytic work.  Mr. Galgano said that following the points system would sacrifice credit quality.

## II. <u>Plaintiffs' Reports to the Board of Directors</u>

90. Concerned that objecting contemporaneously to Egan and Hu or reporting misconduct to them was futile, both Mr. Galgano and Mr. Brawer also reported their concerns regarding potential violations of securities laws and regulations to the board of directors and to outside counsel retained by board to investigate potential misconduct.

91. In the second or third quarter of 2022, Mr. Galgano attended a portion of a meeting of the board of directors, which Mr. Brawer and Hu also attended.  At the meeting, Egan repeated his desire to "improve" the "hit" rate in the Hits and Misses report (*see also* ¶¶ 36-39), and Mr. Galgano objected contemporaneously to Egan's instruction.  Mr. Galgano stated in response that the underlying premise of the Hits and Misses report was flawed and that Egan-Jones should not be managing its ratings to the Hits and Misses report because the law required each credit rating agency to follow its respective analytical criteria regardless of any difference in ratings that would result across rating agencies.

92. On or about March 16, 2023, concerned increasingly by Egan's and Hu's exertion of business pressure on rating analysts, Mr. Galgano telephoned the chairman of the board of directors to report several topics of concern including Hu's attempts to direct analytical

activities.  Concerning the Hits and Misses report, Mr. Galgano explained that, in Mr. Galgano's view, the report was generated and utilized inappropriately.

93. In or about May 2023, Egan-Jones's board of directors engaged outside counsel to investigate potential violations of law that were raised by Mr. Galgano and others.  The outside law firm interviewed Mr. Galgano on May 26, 2023 and on September 11, 2023.  During each interview, Mr. Galgano reported his concerns that the conduct of Egan and Hu improperly injected business influence into the analytical process.  *See* 17g-5(c)(8)(ii).

94. Mr. Brawer communicated concerns about potential violations to the board of directors at formal quarterly meetings of the board.  As the Designated Compliance Officer, Mr. Brawer delivered a regular compliance presentation at each meeting of the board.  After each board meeting, Mr. Brawer also remained on the line for a private session with independent directors. In meetings of the board in June 2023 (conducted remotely), September 2023 (conducted in person in New York, NY), and December 2023 (conducted remotely), Mr. Brawer specifically raised his concerns that business pressure to downgrade credit ratings within the banking sector in May 2023 violated the SEC Order and SEC Rule 17g-5 (*see* ¶¶ 57-62).

95. Mr. Brawer also elevated his concerns to the board outside of these standing quarterly board meetings.  For example, on August 6, 2023, having concluded that Egan and Hu likely violated Rule 17g-5(c)(8), the SEC Order, and certain firm policies and procedures when they pressured ratings analysts to downgrade credit ratings within the banking sector, Mr. Brawer emailed the independent directors and the general counsel requesting a meeting to discuss disciplinary action against Egan and Hu.  Although Mr. Brawer was not permitted to attend the meeting concerning disciplinary action, Mr. Brawer participated in another meeting of the independent directors on August 7, 2023, in which Mr. Brawer provided to the independent

directors additional documentary evidence concerning downgrades within the banking sector. Hu resigned on or about August 9, 2023 before any discipline could be imposed, while Egan received a warning letter.

96. On December 5, 2023, pursuant to the reporting requirement of the Roles and Responsibilities Limitations (*see* ¶ 20), Mr. Brawer authored a memorandum to the board of directors, in which Mr. Brawer stated that, based on the violations by Egan and Hu, Mr. Brawer was unable to conclude that controls intended to ensure compliance with the terms of the SEC Order were operating effectively. Mr. Brawer discussed this memorandum at the meeting of the board of directors on December 20, 2023, two weeks prior to his termination.

### III. <u>Plaintiffs' Reports to the Independent Consultant</u>

97. On or about July 20, 2023, and August 2, 2023, the Independent Consultant interviewed Mr. Galgano regarding his concerns about potential violations of securities laws and the SEC Order. During these interviews, Mr. Galgano reported his concerns about potential violation of law including in relation to business pressure to downgrade the banking sector in May 2023. On or about August 3, 2023, Mr. Galgano transmitted to the Independent Consultant documentary evidence of the same.

98. On or about May 19, 2023, July 10, 2023, July 19, 2023, August 1, 2023, August 8, 2023, and August 11, 2023, the Independent Consultant met with Mr. Brawer. In these sessions, Mr. Brawer reported his concerns about potential violations of the securities laws, rules, and the SEC Order. For example, on May 19, 2023, Mr. Brawer conveyed to the Independent Consultant concerns that Hu was obstructing the implementation of the Independent Consultant's preliminary recommendations required under the SEC Order. Mr. Brawer encouraged the Independent Consultant to share the information with the SEC staff. On August 11, 2023, Mr.

Brawer reported to the Independent Consultant his concern that Hu sought to exert influence at Egan-Jones despite her purported resignation a few days earlier.

99. On August 25, 2023, the Independent Consultant submitted a final report to Egan-Jones and to the SEC.  Among his findings, the Independent Consultant concluded that there is a credible basis to believe that both Egan and Hu may have violated Rule 17g-5(c)(8) and that Egan may also have violated the SEC Order since it was issued.

### IV. <u>Plaintiffs' Reports to the SEC's OCR Staff</u>

100.     As part of their respective duties, Mr. Galgano and Mr. Brawer each met with SEC staff during OCR's annual examination of Egan-Jones and independently reported potential violations of law by Egan and Hu.

101.     In late 2022 or early 2023, Mr. Galgano had a conversation with an employee of OCR in which Mr. Galgano shared his concerns with business pressure that Egan and Hu exerted on ratings analysts.

102.     On May 17, 2023, during the annual examination, OCR staff conducted a meeting with Egan-Jones employees, including Mr. Galgano, at the New York City office of Egan-Jones. At the meeting's conclusion, the OCR staff asked Mr. Galgano to remain behind for some additional questions.  In the presence of Mr. Brawer and the general counsel, the SEC examination staff interviewed Mr. Galgano regarding several topics including:  (i) Egan-Jones's points system for compensation of analytical staff; (ii) Egan-Jones's bonus compensation structure for analytical staff; and (iii) business pressure to alter indicative ratings to induce the customer to engage Egan-Jones to issue the final rating.  In responding to the SEC staff, Mr. Galgano expressed concern with how Egan-Jones managed each of these matters and, in particular, how commercial interests by Egan-Jones management may influence the analytical

staff and ratings outcomes.  For example, as it relates to the points system, Mr. Galgano expressed a concern that the system creates pressure for analysts to produce a certain volume of ratings and risk sacrificing ratings quality in favor of assigning more ratings.  As described in ¶¶ 128-130, upon learning of Mr. Galgano's statements to the SEC, Egan and Hu immediately expressed a desire to terminate Mr. Galgano's employment.

103.     On June 14, 2023, Mr. Brawer advised OCR staff about the allegations made by the IT executive the prior day that Hu instructed the IT executive to lie to the SEC concerning Hu's role (*see* ¶¶ 63-65).  Mr. Brawer advised that he was "deeply disturbed by these allegations" which would be investigated by outside counsel.

104.     On June 16, 2023, Mr. Brawer disclosed additional details to OCR regarding the investigation of Hu's misrepresentation.  Mr. Brawer also advised OCR that Egan-Jones placed Hu on administrative leave pending the outcome of the investigation.

105.     On August 13, 2023, Mr. Brawer advised OCR about an expansion of the internal investigation into the application of business pressure by Egan and Hu for analytical staff to downgrade credit ratings within the banking sector in May 2023.

106.     On September 29, 2023, OCR issued the annual examination report to Egan-Jones for the calendar year 2022 which determined that Hu's points system and Hu's violation of the Marketing Procedures each violated SEC regulations and constituted "material regulatory deficiencies" warranting inclusion in the SEC's annual inspection report to Congress.  The examination report cited concerns raised by Plaintiffs with the SEC regarding these activities at Egan-Jones.

107.     On October 24, 2023, pursuant to Paragraph 72 of the SEC Order, Mr. Brawer submitted a limited certification to the SEC staff, in which Mr. Brawer certified compliance with

the undertakings of the SEC Order subject to certain exceptions.  As relevant here, insofar as the final report of the Independent Consultant of August 25, 2023 indicated that the Independent Consultant was unable to assess relevant policies and could not assess whether Egan violated the prohibition on participating in analytical activities, Mr. Brawer expressly did not certify compliance with Paragraph 69 of the SEC Order requiring Egan-Jones to "prohibit Egan from participating directly or indirectly in (a) determining or monitoring any credit rating issued or maintained by Egan-Jones or (b) developing or approving procedures or methodologies used for determining credit ratings issued or maintained by Egan-Jones, including qualitative and quantitative models."

## V. Plaintiffs' Reports to the SEC Whistleblower Office

108.      In 2023, Mr. Galgano and Mr. Brawer independently filed whistleblower complaints regarding potential violations of law at Egan-Jones with the SEC's Officer of the Whistleblower.

### i. Mr. Galgano's Whistleblower Submissions

109.      On May 25, 2023, Mr. Galgano filed his initial whistleblower complaint through the SEC's website on Form TCR, including his concern that Egan and Hu had tried to influence the rating process by demanding rating downgrades in the banking sector (*see* ¶¶ 49-62), in violation of Rule 17g-5 and the SEC Order settling alleged earlier violations of the same rules.

110.      On June 9, 2023, Mr. Galgano filed a supplemental memorandum expanding on his prior submission and identifying other categories of misconduct including (a) the application of business pressure by Egan and Hu to change Egan-Jones's ratings to align with those of other rating agencies, (b) the application of business pressure by Egan and Hu for analytical staff to downgrade ratings within the banking sector, and (c) potential retaliation for Mr. Galgano's

honest answers to OCR examiners on May 17, 2023 (*see* ¶¶ 128-130).  In Mr. Galgano's

reasonable belief, this conduct constituted "violations of Rule 17g-5(c), the OIP, and Egan-

Jones's policies and procedures."

111.      In subsequent interviews and written communications with the SEC Enforcement

staff, Mr. Galgano continued to provide evidence regarding potential violations of securities laws

at Egan-Jones.  For example, in his interview of June 15, 2023, Mr. Galgano provided

information and expressed his concerns with Egan-Jones's practices involving (1) the points

system, (2) Hits and Misses report, (3) business pressure to change ratings in the banking sector,

and (4) possible retaliation for raising his concerns with the SEC examination team.  On July 17,

2023, Mr. Galgano provided information and expressed his concerns with Egan-Jones's practices

involving (1) the points system, and (2) certain private ratings.  On December 4, 2023, Mr.

Galgano made a supplemental written submission in which he expressed his concern regarding

Hu's ongoing role at Egan-Jones despite her purported resignation.

ii. <u>Mr. Brawer's Whistleblower Submissions</u>

112.      On August 20, 2023, Mr. Brawer filed the first of his four SEC whistleblower

complaints through the SEC website on Form TCR and reported his concerns that (1) Hu and

Egan were intentionally circumventing Egan-Jones's internal control structure to influence

ratings activities, and (2) Egan-Jones had misinformed the SEC staff regarding Hu's resignation

in a manner that may obstruct SEC's investigation of Egan-Jones.  Mr. Brawer supplemented this

report in correspondence with the SEC Enforcement staff in October and November of 2023.

Mr. Brawer actually and reasonably believed that Hu's concealed role circumvented Egan-

Jones's internal control structure designed to ensure compliance with federal securities laws and

regulations and constituted fraud on the federal regulator.

113.    On September 27, 2023, Mr. Brawer submitted a second SEC whistleblower complaint through the SEC website on Form TCR and reported his belief that Egan likely violated the terms of the SEC Order when Egan pressured analysts to downgrade bank ratings on May 5, 2023.

114.    On October 2, 2023, Mr. Brawer informed the SEC staff in writing regarding his discovery that there have been monthly "award" payments (roughly $100 - $300) made to analysts based on the points system.  Mr. Brawer actually and reasonably believed and communicated to the staff that Hu's failure to inform the board of directors about the points system and "award" payments violated the provision of the Dodd-Frank Act that requires a NRSRO's board of directors to oversee "the compensation and promotion policies and practices" of the NRSRO.  *See* 15 U.S.C. 78o-7(t)(3)(D).

115.    On October 6, 2023, Mr. Brawer submitted a third SEC whistleblower complaint through the SEC website on Form TCR and reported his concern that he was unable to implement the board resolution seeking to put in place a chaperone requirements process as a step toward complying with the SEC Order.  Mr. Brawer expressed his concern that Egan was impeding the intended outcome of an investigation by attempting to override the actions of the independent directors and undermine effective board governance at Egan-Jones.

116.    On October 23, 2023, November 26, 2023, November 28, 2023, and December 13, 2023, Mr. Brawer submitted information that supplemented the first SEC whistleblower complaint and expressed concern that Egan-Jones's misrepresentation of Hu's ongoing but hidden role at Egan-Jones "may constitute an intentional fraud against the SEC."

117.    On December 17, 2023, Mr. Brawer submitted his fourth SEC whistleblower complaint through the SEC website on Form TCR and reported his concern concerning possible

retaliation by Egan-Jones against employees who have made good faith allegations of wrongdoing.

118.     On December 20, 2023, Mr. Brawer provided supplemental information to the staff concerning his report to the board of directors earlier that day that Mr. Brawer was unable to conclude that controls intended to ensure compliance with the terms of the SEC Order are operating effectively based on the findings of the internal investigation.

119.     In interviews with the SEC Enforcement staff on September 15, 2023, September 22, 2023, October 24, 2023, and November 11, 2023, as well as supplemental electronic submissions, Mr. Brawer continued to provide evidence regarding the potential violations of securities laws at Egan-Jones described in his written complaints.

### D.  DEFENDANTS RETALIATED AGAINST PLAINTIFFS BECAUSE OF PLAINTIFFS' PROTECTED ACTIVITY

120.     After Hu and Egan learned that Mr. Brawer and Mr. Galgano reported potential violations of securities laws and regulations internally and externally, in the manner described above, Hu and Egan (i) harassed Plaintiffs, (ii) repeatedly threatened Plaintiffs with termination, demotion, and reassignment, and (iii) ultimately terminated Plaintiffs' employment on January 3, 2024 because of Plaintiffs' protected activity.

### I.  Threats to Mr. Brawer's Career After Mr. Brawer Reported to Executive Management that Hu had Willfully Violated Egan-Jones's Marketing Procedures

121.     On September 21, 2022, after Mr. Brawer initiated an investigation into the allegation that Hu violated the Marketing Procedures during a phone call with a client (*see* ¶¶ 40-48), Hu stated to Mr. Brawer in sum and substance that: "With the e-mail you sent about [the analyst], it will affect your career with the company."

122.      Later in the day on September 21, 2022, Mr. Brawer informed Egan (with Hu present on the call) that Hu had willfully violated, and had instructed the representative of Egan-Jones's commercial staff to violate, the Marketing Procedures and that Hu had later threatened Mr. Brawer's career for having raised the violation.  Hu concluded the meeting by raising the prospect of hiring additional compliance staff who might ultimately replace Mr. Brawer, which Mr. Brawer understood to be a threat of demotion, reassignment, or termination.

123.      On October 10, 2022, Mr. Brawer called Hu to discuss Egan-Jones's obligation to take disciplinary action following the earlier conclusion that she had violated the Marketing Procedures.  Hu insisted that Mr. Brawer and the general counsel had misinterpreted Egan-Jones's procedures and that Hu had not violated them.  Hu repeated her intention to hire another employee for regulatory interpretations and compliance investigations, which Mr. Brawer understood to be a threat to his career.  Hu also stated that she intended to obtain a second opinion from an outside lawyer for Egan-Jones.  Hu insisted that the general counsel's investigation memo concluding that Hu violated Egan-Jones's policies was faulty and that it would be a good idea to have another lawyer perform a new, fresh investigation.

124.      On March 24, 2023, during a meeting on the state of internal controls in 2022 (attended by, among others, Mr. Brawer, Egan, Hu, and the general counsel), Hu informed Mr. Brawer that she was "extremely disappointed" in Mr. Brawer for continuing to list Hu's violation of the Marketing Procedures on the 2022 Exception Log.

**II. Attempted Demotion of Mr. Galgano after Mr. Galgano Expressed Concerns to Senior Management Regarding Pressure to Downgrade Ratings in the Banking Sector**

125.      On Saturday, March 11, 2023, after Mr. Galgano objected to Egan's and Hu's pressure to downgrade SVB Financial Group by morning of Monday, March 13, 2023 (*see* ¶¶ 52, 84), Egan and Hu telephoned Mr. Brawer and directed Mr. Brawer to circumvent Mr.

Galgano and instead to communicate going forward directly with analytical staff supervised by Mr. Galgano.  Mr. Brawer responded that he would refuse to withhold any matters having a material impact on the work of the analytical team from Mr. Galgano, as head of the analytical team.

126.     On Sunday, March 12, 2023, Hu telephoned Mr. Brawer and directed him to contact analytical staff and to instruct them that they should cease updating bank credit ratings based solely on their own judgment and should review information conveyed by the general counsel of Egan-Jones regarding any further ratings actions.  Mr. Brawer stated that he would not provide these instructions to analytical staff due to the requirement that Egan-Jones maintain the integrity of its ratings process.  Hu abruptly ended the call.

127.     Also on Sunday, March 12, 2023, Mr. Galgano learned from certain Egan-Jones analysts that Hu had called them and instructed them regarding how and with whom to hold bank rating committees, and that Hu instructed the analysts not to discuss these analytical matters with Mr. Galgano.  Mr. Galgano understood this to be an attempt at demotion and reassignment in retaliation for Mr. Galgano's resistance to business pressure to downgrade bank ratings.

### III. Attempted Termination of Mr. Galgano Following Mr. Galgano's Report to OCR Concerning the Influence of Commercial Interests on Analytical Staff and Ratings

128.     On May 17, 2023, immediately after Mr. Galgano's conversation with OCR examiners in Egan-Jones's office in New York in which Mr. Galgano expressed concern with how commercial interests by Egan-Jones management may influence the analytical staff and ratings outcomes (*see* ¶ 102), Hu asked Mr. Brawer and the general counsel what Egan-Jones could do to terminate Mr. Galgano's employment at Egan-Jones.  Mr. Brawer and the general counsel informed Hu that Mr. Galgano was protected by anti-retaliation policies.

129.     On May 22, 2023, the general counsel informed Mr. Brawer and a newly

appointed head of Human Resources (who took over Hu's responsibilities for human resources)

that Hu had pressured the general counsel earlier in the day to explore options to either replace or

demote Mr. Galgano.  The general counsel stated that he had made clear to Hu that retaliation

against Mr. Galgano was prohibited.

130.     Later the same day, May 22, 2023, the chairman of the board and the general

counsel each communicated to Mr. Brawer in separate conversations that Hu had raised with

each of them the proposal that a performance review of Mr. Galgano be conducted and that he be

terminated or demoted after the review.  The general counsel informed Mr. Brawer that Hu had

indicated that she planned to attribute the termination to the chairman of the board of directors.

The chairman of the board told Mr. Brawer a termination of Mr. Galgano would likely constitute

prohibited retaliation.

### IV. Defendants' Retaliatory Termination of Plaintiffs' Employment Following Plaintiffs' Submission of Whistleblower Complaints to the SEC

131.     After threatening Mr. Brawer with termination in 2022 and attempting to demote

and terminate Mr. Galgano in 2023, Defendants carried through with their threats and terminated

Plaintiffs on January 3, 2024 in retaliation for Plaintiffs' good faith reports of their concerns

regarding violation of federal statutes, rules, and the SEC Order at Egan-Jones to internal and

external stakeholders.

132.     In addition to Defendants' direct knowledge of Plaintiffs' internal complaints and

Mr. Galgano's report to OCR on May 17, 2023, upon information and belief, Defendants knew

that Plaintiffs filed whistleblower complaints to the SEC when they terminated Plaintiffs'

employment.

133.    Among other indications of such knowledge, on or about June 16, 2023, Mr. Galgano was contacted by an executive recruiter with experience in the credit rating industry, who told Mr. Galgano that the recruiter had learned that there is a whistleblower at Egan-Jones. Upon information and belief, the executive recruiter and Egan are familiar with each other and were in communication during this time period.

134.    In addition, in response to an unrelated SEC inquiry, Egan-Jones took steps to collect work-related text messages from Mr. Galgano's personal devices, and Mr. Galgano insisted on taking steps to reduce the risk that his non-work communications would be disclosed to Egan-Jones because they might overtly reveal him to be a whistleblower.  Through counsel, Mr. Galgano provided work-related text messages to Egan-Jones on August 30, 2023, which included communications by Mr. Galgano highly critical of Egan and Hu.  The disclosure of those communications to Egan-Jones, as well as the additional efforts by Mr. Galgano to protect his personal communications from disclosure, also alerted Egan-Jones to the existence of a whistleblower.

135.    Further, after the chairman of Egan-Jones's board of directors resigned in August 2023, Mr. Brawer explicitly informed the former director that Mr. Brawer had filed an SEC whistleblower complaint earlier in the year, believing that the director was no longer affiliated with Egan-Jones.  On December 20, 2023, at a meeting of the board of directors, Egan stated that the former chairman remained an advisor for Egan-Jones.

136.    Two weeks later, on January 3, 2024, Mr. Galgano and Mr. Brawer each received an invitation for a video conference with the head of Human Resources and the general counsel of Egan-Jones.  Each Plaintiff was terminated effective the same day.

137.     Upon information and belief, no other employee of Egan-Jones was terminated on January 3, 2024.

138.     Neither Plaintiff received any adverse performance review prior to their abrupt terminations.

139.     In the year prior to termination, Egan-Jones offered each Plaintiff a retention agreement to encourage their remaining at Egan-Jones.

### FIRST CLAIM FOR RELIEF
### Retaliation In Violation of the Dodd-Frank Act
### 15 U.S.C. § 78u-6(h)

140.     Plaintiffs reallege and incorporates by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

141.     At all times material hereto, the whistleblower protection provision of the Dodd-Frank Act, 15 U.S.C. § 78u-6(h), was in effect and binding on Defendants. It permits individuals who allege discharge or other discrimination to bring an action in United States District Court for relief.

142.     At all relevant time periods, Plaintiffs were "employees" of Defendant Egan-Jones.

143.     At all relevant time periods, Defendants were Plaintiffs' "employers."

144.     Plaintiffs engaged in a "lawful act" within the meaning of Section 78u-6(h) -- namely the reporting of conduct that Plaintiffs actually and reasonably believed to be specific violations of securities laws and regulations by, among others, Egan-Jones, Egan, and Hu (i) internally to persons with supervisory authority over Plaintiffs and such other persons working for Egan-Jones who has the authority to investigate, discover, or terminate misconduct, and (ii) externally to the SEC (OCR, Office of the Whistleblower, and Division of Enforcement).

145.    Plaintiffs' belief that Egan-Jones, Egan, and Hu were violating specific violations of securities laws and regulations, including Section 15E of the Exchange Act, Rule 17g-5, and the SEC Order was objectively reasonable because, among other things:

a.    Egan-Jones was already under the SEC Order arising from prior violation of several provisions of Rule 17g-5 and Section 15E(h)(1) of the Exchange Act from 2016 through mid-2019.

b.    The Independent Consultant concluded that there is a credible basis to believe that both Egan and Hu may have violated Rule 17g-5(c)(8) and that Egan may also have violated the SEC Order since it was issued.

c.    OCR's examination report issued to Egan-Jones for the calendar 2022 contained findings (regarding the points system and violation of the Marketing Procedures) that, in the view of the SEC staff, rose to the level of "material regulatory deficiencies" meriting inclusion in the annual inspection report to Congress.

d.    Mr. Galgano's and Mr. Brawer's whistleblower complaints were deemed by SEC staff to have sufficient merit to warrant follow-up interviews with each of them.

e.    Several other analysts shared Mr. Galgano's and Mr. Brawer's concern regarding Hu's and Egan's improper business pressure on analysts.

146.    By making internal reports of relating to the violation of securities laws and regulations to executive management, the general counsel, and the board of directors, Plaintiffs made disclosures that are independently protected under the Sarbanes-Oxley Act of 2002.  *See* 18 U.S.C. § 1514A.

147.    By the filing of a Form TCR through the SEC's website, Plaintiffs each made a written report relating to the violation of securities laws and regulations, rendering each Plaintiff

a "whistleblower" within the meaning of the Dodd-Frank Act.  Following their initial submission of Form TCR, each Plaintiff cooperated with SEC's Division of Enforcement in the investigation of Egan-Jones.

148.    Defendants knew that Plaintiffs engaged in protected activity, namely (i) internal reports of wrongdoing to executive management, the general counsel, and the board of directors; and (ii) external reports of wrongdoing to the SEC (OCR, Office of the Whistleblower, and Division of Enforcement).

149.    Defendants harassed, threatened, discharged and retaliated against Plaintiffs after Defendants learned that Plaintiffs made oral and written complaints regarding what they actually and reasonably believed to be illegal or unlawful conduct in violation of federal statutes, rules and regulation.

150.    Following their submission of Form TCRs and cooperation with the Division of Enforcement, each Plaintiff suffered an adverse employment action on January 3, 2024, when each was terminated.

151.    Defendants threatened, harassed, and ultimately terminated Plaintiffs' employment because of and in retaliation for Plaintiffs' protected lawful acts.

152.    Plaintiffs suffered harm by reason of Defendants' unlawful conduct and have suffered losses and damages, including a loss of earnings and other employment benefits, in an amount to be proven.

153.    Plaintiffs seek all relief allowable by law.

### SECOND CLAIM FOR RELIEF
### Retaliation in Violation of New York Labor Law § 740

154.    Plaintiffs reallege and incorporate by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

155.     At all relevant time periods, Egan-Jones maintained an office in New York, NY and was subject to New York Labor Law.

156.     At all relevant time periods, Plaintiffs were "employees" of Defendant Egan-Jones.

157.     At all relevant time periods, Defendants were Plaintiffs' "employers."

158.     Egan, Hu, and members of the board of directors were each a "supervisor" within the meaning of New York Labor Law § 740(1)(f).

159.     The actions of Defendants were in direct violation of the New York Labor Law § 740.

160.     Plaintiffs reasonably believed that the conduct described above was a violation of a law, rule, or regulation.

161.     Plaintiffs contemporaneously objected to and refused to participate in conduct that Plaintiffs reasonably believed was a violation of a law, rule, or regulation.

162.     Plaintiffs provided information to, and testified before, a public body (to wit, the SEC) conducting an investigation into such conduct by Egan-Jones.

163.     Plaintiffs disclosed to their supervisors and to a public body (to wit, the SEC), conduct that Plaintiffs reasonably believed was a violation of a law, rule, or regulation.

164.     Defendants engaged in prohibited retaliatory action against Plaintiffs because they engaged in protected conduct.

165.     Plaintiffs suffered harm by reason of Defendants' unlawful conduct and have suffered losses and damages, including a loss of earnings and other employment benefits, in an amount to be proven.

166.     Plaintiffs seek all relief allowable by law.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request:

a)      Statutory damages;

b)      Compensatory damages;

c)      Reinstatement of employment or front pay on lieu thereof;

d)      Double back compensation and employee benefits, with interest;

e)      A civil penalty;

f)      Punitive damages;

g)      Reasonable attorneys' fees and expenses; and

h)      That the Court enter a judgment awarding such other relief as the Court deems

just and proper.


Dated:  New York, New York
        March 13, 2024

                              Respectfully submitted,

                              PETRILLO KLEIN & BOXER LLP

                    By:     /S/ Adam H. Schuman

                            Adam H. Schuman
                            655 Third Avenue
                            22nd Floor
                            New York, New York 10017
                            Telephone:  (212) 370-0330
                            aschuman@pkbllp.com

                            *Counsel for Plaintiffs*